IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 25-cr-00194-JLK

UNITED STATES OF AMERICA,

Plaintiff,

v.

MOHAMED SABRY SOLIMAN,

Defendant.

---

# PLEA AGREEMENT

---

The United States of America (the government), by and through Melissa Hindman and Daniel Pastor, Assistant United States Attorneys for the District of Colorado; Sarah Howard and Khalil Quinan, Trial Attorneys for the Civil Rights Division; and the defendant, Mohamed Sabry Soliman, personally and by counsel, David Kraut, Jennifer Wickens, and Kelly Christl, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado, the Civil Rights Division of the Department of Justice, and the defendant.

## I. PLEA AGREEMENT

### A. Defendant's Agreement

The defendant agrees to:

(1) waive indictment and plead guilty to an Information charging the following:

a. One count in violation of 18 U.S.C. § 249(a)(2)(A)(ii)(I), (B)(i)(II), (B)(ii), (B)(iii), and (B)(iv)(II) (hate crime resulting in death);

b. Seven counts in violation of 18 U.S.C. § 249(a)(2)(A)(ii)(II), (B)(i)(II), (B)(ii), (B)(iii), and (B)(iv)(II) (hate crime involving bodily injury and an attempt to kill);



COURT EXHIBIT
1

c. One count in violation of 18 U.S.C. § 249(a)(2)(A)(ii)(II), (B)(i)(II), (B)(ii), (B)(iii), and (B)(iv)(II) (hate crime involving attempt to cause bodily injury and an attempt to kill);

d. Two counts in violation of 18 U.S.C. § 844(h)(1) (using fire or an explosive to commit a felony); and

e. One count in violation of 18 U.S.C. § 844(h)(2) (carrying an explosive during the commission of a felony);

(2) waive certain appellate and collateral attack rights, as explained in detail below;

(3) waive certain rights to discovery, as explained in detail below;

(4) withdraw all pending motions, including the defendant's motions to preclude the removal of witnesses (ECF Nos. 77, 87, 101, and associated filings);

(5) be liable for restitution in an amount to be determined at sentencing or agreed upon by the parties;

(6) not contest forfeiture and abandon his interest in certain property, as described below;

(7) not object to victim impact statements being presented at sentencing from victims as well as affected family members and community members; and

(8) not object to serving his sentence in the federal Bureau of Prisons.

**B. Government's Obligations**

This agreement is made pursuant to Fed. R. Crim. P. 11(c)(1)(B). The parties will jointly recommend the following: a sentence of life imprisonment on each of Counts One through Nine, to run concurrently with each other; a sentence of ten years' imprisonment on Count Ten to run consecutive to the sentence imposed on Counts One through Nine; and a sentence of twenty years' imprisonment on each of Counts Eleven and Twelve to run consecutive to the sentence imposed on Counts One through Ten. The parties will jointly recommend that the total sentence recommended by the parties—life imprisonment plus fifty years' imprisonment—will be consecutive to the sentence imposed in Boulder County case number 25CR785.

The government further agrees to move to dismiss Counts One through Twelve of the Indictment. Should the plea of guilty be vacated on the motion of the defendant, the government

may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file a Superseding Indictment that charges new or additional counts, including those referenced in the Information. The parties understand that this agreement is not binding on the Court.

Provided the defendant does not engage in prohibited conduct or otherwise implicate U.S.S.G. §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b).

If the defendant engages in conduct which implicates U.S.S.G. §§ 3C1.1 cmt. n.4 between the guilty plea and sentencing in this case, in addition to any other consequences, the government will be released from its obligations under the plea agreement, and the defendant will not thereby have any right to withdraw from the plea agreement.

**C. Defendant's Waiver of Appeal**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless the government appeals the sentence imposed. In the event the government appeals, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2) the defendant was deprived of the effective assistance of counsel; or

(3) the defendant was prejudiced by prosecutorial misconduct.

The United States agrees not to argue a procedural bar to a prosecutorial misconduct claim raised in a § 2255 petition based on the failure of the defendant to raise that issue on direct appeal.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

**D. Waiver of Discovery**

As part of this plea agreement and based upon the concessions of the United States in this plea agreement, the defendant knowingly, willingly, and voluntarily gives up the right to seek any additional discovery. Further, the defendant knowingly, willingly, and voluntarily waives all pending requests for discovery. This waiver, however, shall not apply to any discovery that negates the defendant's guilt or materials the government intends to use at sentencing.

**E. Restitution**

The defendant understands that, pursuant to 18 U.S.C. § 3663A, the Court must order restitution for the full amount of the victims' compensable losses. For purposes of this paragraph, the term "victim" is defined in 18 U.S.C. § 3663A(a)(2), and the factors used to determine the loss are defined in 18 U.S.C. § 3663A(b)(2). The defendant agrees to pay restitution to the victims in an amount to be determined by the Court at sentencing or agreed upon by the parties. The defendant understands the amount of Court ordered restitution will not be a basis to withdraw the defendant's guilty plea.

With respect to restitution, the defendant agrees to fully: (1) cooperate in the investigation of the amount of loss and the identification of victims; (2) comply with any restitution order entered at the time of sentencing; and (3) cooperate in all efforts to collect restitution by any means deemed appropriate by the United States.

The defendant understands that neither personal economic circumstances or resources, nor the fact that the victims have or are entitled to receive compensation for their injuries from the proceeds of insurance or any other source, are grounds the Court may use to deny restitution.

The defendant understands that the imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action. The defendant agrees that any

restitution imposed will be non-dischargeable in any bankruptcy proceeding and the defendant will not seek a discharge of the restitution obligation.

**F. Forfeiture**

The defendant admits the forfeiture allegation contained in the Information. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(2)(B) and 28 U.S.C. § 2461(c) whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The assets to be forfeited specifically include but are not limited to any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violations, and pursuant to Title 18, United States Code, Section 844(c) and Title 28, United States Code, Section 2461(c), any explosive materials involved or used or intended to be used in the violations. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offenses, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met. The defendant understands that the United States Attorney's Office only has authority to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

### G. Abandonment of Property

The defendant agrees that all digital devices seized from the defendant, his residence, or his vehicle, which were seized from the defendant for evidentiary purposes, and which are currently in the custody or control of the Federal Bureau of Investigation, were lawfully seized and are evidence, contraband, or fruits of the crimes to which the defendant is pleading guilty. The defendant relinquishes and abandons all claims, title, and interest the defendant has in such property with the understanding and consent that Federal Bureau of Investigation may dispose of the property without further obligations.

## II. ELEMENTS OF THE OFFENSES

The elements of an offense are those facts which must be proved beyond a reasonable doubt before any defendant may be convicted of the charged offense. The parties acknowledge that the elements of the offenses to which defendant's pleas will be tendered are as follows:

## COUNT 1

The parties agree that the hate crime charged in Count 1 in the Information, in violation of 18 U.S.C. § 249(a)(2)(A)(ii)(I), (B)(i)(II), (B)(ii), (B)(iii), and (B)(iv)(II), requires proof of the following elements:[1]

1. The defendant willfully caused bodily injury to the person identified in the relevant Count of the Information;
2. The defendant acted because of the actual or perceived religion or national origin of any person;
3. The conduct occurred during the course of or as a result of the travel of the defendant using a channel, facility, or instrumentality of interstate or foreign commerce; the defendant used a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct; in connection with the conduct, the defendant employed a firearm, dangerous weapon, explosive or incendiary device, or other weapon that had traveled in interstate or foreign commerce; or the conduct otherwise affected interstate or foreign commerce; and
4. The defendant's offense resulted in the death of the person identified in the relevant count of the Information.

## COUNTS 2–8

The parties agree that the hate crimes charged in Counts 2 through 8 of the Information, in violation of 18 U.S.C. § 249(a)(2)(A)(ii)(II), (B)(i)(II), (B)(ii), (B)(iii), and (B)(iv)(II), requires proof of the following elements:[2]

1. The defendant willfully caused bodily injury to the person identified in the relevant count of the Information;
2. The defendant acted because of the actual or perceived religion or national origin of any person;
3. The conduct occurred during the course of or as a result of the travel of the defendant using a channel, facility, or instrumentality of interstate or foreign commerce; the

---

[1] *See* Plea Agreement, *United States v. Aldrich*, 24-cr-0006-CNS, ECF No. 34 (D. Colo. June 18, 2024) (relying on Jury Instructions, *United States v. Howald*, 6:21-cr-0004-BMM, ECF No. 138 (D. Mt. Feb. 17, 2023) and *United States v. Bowers*, 2:18-cr-00292-RJC, ECF No. 1357 (W.D. Pa. June 19, 2023)).

[2] *See* Plea Agreement, *United States v. Aldrich*, 24-cr-0006-CNS, ECF No. 34 (D. Colo. June 18, 2024) (relying on Jury Instructions, *United States v. Howald*, 6:21-cr-0004-BMM, ECF No. 138 (D. Mt. Feb. 17, 2023) and *United States v. Bowers*, 2:18-cr-002920RJC, ECF No. 1357 (W.D. Pa. June 19, 2023)).

defendant used a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct; in connection with the conduct, the defendant employed a firearm, dangerous weapon, explosive or incendiary device, or other weapon that had traveled in interstate or foreign commerce; or the conduct otherwise affected interstate or foreign commerce; and

4. The offense included an attempt to kill, that is the defendant took a substantial step towards intentionally killing the person identified in the relevant count of the Information.

**COUNT 9**

The parties agree that the hate crime charged in Count 9 of the Information, in violation of 18 U.S.C. § 249(a)(2)(A)(ii)(II), (B)(i)(II), (B)(ii), (B)(iii), and (B)(iv)(II), requires proof of the following elements:[3]

1. The defendant willfully attempted to cause bodily injury through the use of fire, a dangerous weapon, or an explosive or incendiary device;[4]
2. The defendant acted because of the actual or perceived religion or national origin of any person;
3. The conduct occurred during the course of or as a result of the travel of the defendant using a channel, facility, or instrumentality of interstate or foreign commerce; the defendant used a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct; in connection with the conduct, the defendant employed a firearm, dangerous weapon, explosive or incendiary device, or other weapon that had traveled in interstate or foreign commerce; or the conduct otherwise affected interstate or foreign commerce; and
4. The offense included an attempt to kill, that is the defendant took a substantial step towards intentionally killing the individuals identified in the relevant count of the

---

[3] These elements are similarly derived from the Plea Agreement in *United States v. Aldrich*, *see supra* n.7.

[4] The definition of "explosive" incorporates the definition of "other explosive or incendiary devices" under § 232(5). *See* 18 U.S.C. § 844(j). Section 232, in turn, defines ''explosive or incendiary device'' as "(A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone." *See* 18 U.S.C. § 232(5). The Tenth Circuit has also held that "[i]t is common knowledge that gasoline is highly combustible and capable of exploding," and when gasoline is used in certain circumstances, it is within the definition of explosion in § 844(j). *United States v. Poulos*, 677 F.2d 939 (10th Cir. 1982).

Information.

**COUNTS 10–11**

The parties agree that the explosives crimes charged in Counts 10 and 11 of the Information, in violation of 18 U.S.C. § 844(h)(1), requires proof of the following elements:[5]

1. The defendant used fire or an explosive; and
2. The defendant did so to commit a felony which may be prosecuted in federal court [*see* Counts 1 through 9].

**COUNT 12**

The parties agree that the explosives crime charged in Count 12 of the Information, in violation of 18 U.S.C. § 844(h)(2), requires proof of the following elements:[6]

1. First, the defendant carried an explosive; and
2. Second, the defendant did so during the commission of a felony which may be prosecuted in federal court [*see* Counts 1 through 9].

## III. STATUTORY PENALTIES

The parties acknowledge that the statutory penalties for the offenses to which defendant's pleas will be tendered are as follows:

The maximum sentence for violations of Counts One through Nine of the Information are: not more than life imprisonment; maximum term of supervised release of five years; maximum fine $250,000; $100 mandatory victim's fund assessment fee; restitution in an amount to be determined at the time of sentencing or an amount stipulated to by the parties. The Court will

---

[5] The Tenth Circuit does not have a pattern jury instruction for this charge. The elements are derived from 18 U.S.C. § 844(h). *See United States v. Ressam*, 553 U.S. 272, 274 (2008); *United States v. Tolliver*, 730 F.3d 1216, 1223 (10th Cir. 2013).

[6] *See supra* n.5.

impose a separate sentence on each count of conviction and may impose such sentences to run either concurrently with (at the same time) or consecutively to (one after the other) each other.

The statutory penalty for violations of Counts Ten through Twelve of the Information are: 10 years' imprisonment to run consecutive to other sentences for the first count of conviction and 20 years' imprisonment to run consecutive to other sentences for a second or subsequent conviction.

## IV. OTHER CONSEQUENCES

The defendant acknowledges that conviction in this matter may have consequences beyond any sentence this Court may impose. Conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, to vote, to hold elected office, and to sit on a jury. If the defendant is not a United States citizen, conviction may cause the defendant to be removed from the United States or to be subjected to prolonged confinement if there is no country to which the defendant may be deported, to be denied admission to the United States in the future, and to be denied citizenship. Such immigration consequences are practically inevitable if any offense of conviction is an "aggravated felony." [7]

## V. WAIVER OF RIGHTS OF DEFENDANT

Defendant does not have to plead guilty and, instead, can demand a trial before a jury of twelve people. Defendant is aware that at a jury trial, the defendant would have the following rights:

- The right to have the assistance of an attorney at trial and at every stage of the proceedings in this matter;

[7] An "aggravated felony" is defined in 8 U.S.C. § 1101(a)(43). An "aggravated felony" includes murder, rape, sexual abuse of a minor, child pornography, trafficking in controlled substances, trafficking in firearms, money laundering, passport fraud, crimes of violence and other serious offenses that are described in that statute.

- The right to have such counsel appointed for defendant at no cost to the defendant if the defendant is financially unable to afford to retain counsel;

- The right to observe the witnesses who testify against the defendant;

- The right to cross-examine all witnesses who testify against the defendant;

- The right to call such relevant witnesses and evidence as is desired, and to obtain subpoenas to require the attendance and testimony of those witnesses;

- The right to have witness fees and expenses, including reasonable fees charged by expert witnesses, paid by the government if the defendant is unable to afford such costs;

- The right against self-incrimination, meaning that the defendant cannot be called as a witness by the government or required to testify by the government in its presentation of evidence;

- The right to testify at trial if the defendant wants to testify in the defendant's own defense after having seen and heard the government's evidence at trial; and

- The right to have the Court tell the jury, if the defendant chooses not to testify or to present any evidence, that no guilt or inference against the defendant may be drawn from the decision not to testify or present evidence.

Defendant understands that, at trial, the jury cannot find the defendant to be guilty of any offense unless the government proves each and every element of that offense to the jury beyond a reasonable doubt. Defendant further understands that the defendant cannot be convicted of any offense unless all of the jurors agree that the government has met this burden of proof.

Defendant understands that if the defendant were to go to trial and be convicted, then defendant would have the right to appeal both the conviction and the sentence imposed by the Court. All costs associated with that appeal would be paid by the government if the defendant could not afford to pay such costs.

Defendant understands that by choosing to plead guilty, the defendant is giving up all of the rights specified above. There will be no trial. There will be no further examination of the issue

of guilt. Moreover, if the plea agreement contains an appeal waiver, no appeal of any sentence imposed will be heard other than as permitted by that waiver.

## VI. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty pleas that the defendant will tender which satisfies all of the elements of the offenses. That basis is set forth below.

This stipulation of facts does not preclude either party from later providing the Court with additional facts (which do not contradict the facts to which the parties have stipulated below) for the Court to consider in connection with guideline computations or any other matter relevant to sentencing.

The parties stipulate and agree as follows:

On June 1, 2025, the defendant, Mohamed Sabry Soliman, lit two Molotov cocktails and threw them at a group of people, attempting to kill them because of their actual or perceived Israeli national origin and Jewish religion. The defendant violently used these explosives to cause permanent and life-threatening injuries to several victims and to cause the death of Victim A.

### A. The June 1, 2025 Attack

On June 1, 2025, the Boulder chapter of Run for Their Lives—a group that organized walks in various cities across the United States to raise awareness for hostages who continued to be held after the October 7, 2023 attack in Israel—held their weekly walk down Pearl Street. During the walk, they silently held banners, American and Israeli flags, and posters depicting individuals of various nationalities who continued to be held hostage. This scheduled walk had been posted publicly on the group's Facebook page as shown below:




At one point during their walk, the group stopped in front of the Boulder Courthouse to take group photos. At approximately 1:30 pm, while the group was stopped in front of the courthouse, the defendant yelled "Free Palestine" as he threw two glass jars filled with gasoline and stuffed with a rag to act as a wick (commonly referred to as "Molotov cocktails"). The Molotov cocktails exploded and caused significant injuries to several people. At the time, approximately twenty members of the Run for Their Lives group were in the crowd, and at least ten more people were in the immediate vicinity within the park.

As seen on a video taken by a bystander, when the defendant threw the second explosive he caught his own clothing on fire. The defendant then removed his shirt and the weed sprayer filled with gasoline that he was wearing on his back, and grabbed two more unlit Molotov cocktails from the box he had brought with him. Several people from the crowd filmed the defendant as he stood shirtless, holding two unlit Molotov cocktails and ranting against "Zionists." Boulder Police arrived promptly and arrested him.

**B. Injuries Sustained by the Victims**

Seven members of the Run for Their Lives group were treated at the hospital for the burns they sustained from the Molotov cocktails—several of whom remained in the hospital for a

significant period of time thereafter or required ongoing treatment after their release. Victim A was intubated immediately and died of her injuries after spending more than three weeks in the hospital.

One additional victim was later identified as having sustained injuries that did not require treatment. Others in the Run for Their Lives group and other individuals in the park in front of the courthouse at the time of the attack were victimized by the defendant's conduct but did not sustain serious physical injuries. Several of these people reported being close enough to feel the heat of the fire but were not injured.

Below is a chart of the specific injuries of the victims in Counts 1 through 9 of the Information:

| **Hate Crime Count** | **Victim** | **Injuries** |
|---|---|---|
| Count 1 | Victim A | On June 26, 2025, Victim A died of her injuries, including burns on 49.25% of her total body area. The autopsy concluded that Victim A "died as a result of thermal injuries with complications" with the manner of death being homicide. |
| Count 2 | Victim B | Victim B was treated in the hospital for several weeks for significant burns on the lower half of his body. He remained in the hospital when his wife, Victim A, died. Since returning home, he has needed significant assistance and ongoing treatment. |
| Count 3 | Victim C | Victim C was treated in the hospital for several weeks for second and third degree burns on her left side from her waist to her feet. She returned to the hospital later for skin graft surgery, and approximately 40% of her legs were burned. |
| Count 4 | Victim D | Victim D had significant burns to both legs that required skin graft surgeries and ongoing treatment thereafter. |
| Count 5 | Victim E | Victim E had second degree burns to her legs, hands, and knees, with her neck and face red "like a sunburn." |
| Count 6 | Victim F | Victim F had second and third degree burns on both legs and feet and a shoulder injury. She was discharged from the hospital within a few days of the incident but required additional treatment thereafter. Victim F was a vulnerable |

| | | |
|---|---|---|
| | | victim as she was 88 years old at the time of the attack, and her physical condition, including a fused vertebra, affected her ability to flee from the fire and impeded her recovery of the burns on her feet and legs. |
| Count 7 | Victim G | Victim G had second degree burns on approximately 15% of her body, including both legs and feet. She was discharged from the hospital within a few days of the incident and then returned for additional treatment due to complications. She has had ongoing pain and may need laser surgery. |
| Count 8 | Victim H | Victim H received second degree burns to his forearm while trying to extinguish the flames from Victim A. |
| Count 9 | Victim Group: Members of Run For Their Lives and other individuals in the park at the time of the attack | Some members of the group felt the heat of the fire. Some had hair singed either from the fire or from responding to those who were injured. One reported an injured ankle when assisting an injured victim. One reported a strained hamstring when running away from the attack. Numerous victims experienced psychological trauma without physical injuries. |

### C. Evidence Recovered From the Scene

At approximately 1:10 pm, surveillance video in the area shows the defendant approaching the park in front of the courthouse prior to the attack. At that time, he was wearing a white t-shirt, jeans, an orange vest, a blue baseball cap, and sunglasses. He was also carrying a black plastic tote bin with a yellow lid with some flowers on top of the lid and had a backpack weed sprayer on his back.

The picture below shows the defendant in the background to the left of the image behind two members of the Run for Their Lives group carrying an Israeli flag in the park in front of the courthouse just before the attack:



The individual carrying the Israeli flag in the picture included above was also wearing a traditional Jewish head covering known as a kippah or a yarmulke.

After the attack, several items were recovered from the area near where the defendant had been standing when he threw the Molotov cocktails. These items included the burned blue baseball hat and the gasoline-filled backpack sprayer intertwined with the orange vest and white t-shirt. The white t-shirt had burn marks, was pulled inside out, and had the number "1187" written in red sharpie on the front.[8] A Motorola cellphone, two lighters, a knife, and two unlit carafe Molotov cocktails were also nearby.

[8] As described below, the defendant's manifesto describes "1187" as the year "Muslims returned and liberated Jerusalem, after 88 years of oppression and persecution."



In the same area under a tree, the black plastic tote bin was found containing additional Molotov cocktails. The yellow lid was next to the black bin and the flowers were on the lid. Inside the bin were at least 14 Molotov cocktails, three were made from glass carafes with plastic lids, and several more were made from glass Ball jars with metal lids. Each was filled with gasoline, and most of them had red rags made from a towel coming out of the top. A field test showed that the liquid in the Molotov cocktails was 87 octane gasoline. The FBI has analyzed swabs from the carafes, jars, and the backpack weed sprayer and confirmed the liquid was gasoline.

Forensic testing was done by FBI labs in Quantico, Virginia of physical evidence taken from the scene, from the defendant on consent, and from victims' clothing. The information analyzed confirms that the defendant used a Molotov cocktail made of a glass carafe, towel, and gasoline. The glass carafes, towels, and gasoline were purchased in Colorado but manufactured outside of Colorado, meaning the items had traveled in interstate commerce before the defendant's purchase and use of them.



**D. "Manifesto" and Other Evidence Recovered from the Defendant's Car**

Pursuant to a federal search warrant, the FBI searched the defendant's 2015 silver Prius, which was parked near the courthouse. Red gas cans, funnels, and numerous documents were found in the car. Among the documents were a hand-written "manifesto"; printed slides about Zionism and people killed by Israelis; and a chart of countries to which the United States gives aid.

Among the handwritten notes were a list of streets in the Denver area. There was also a page on which the defendant wrote, "1 pm on the corner of Pearl & 8th walks the length of the Pearl Street mall & back stopping at the courthouse for a brief video." This coincides with the publicly available information about the Run for Their Lives planned walk on the date of the attack.

In the "manifesto" documents, the defendant defines Zionists as "our enemies untill [sic] Jerusalem is liberated and they are expelled from our land," and 1187 as the year "Muslims returned and liberated Jerusalem, after 88 years of oppression and persecution." The entire text of the handwritten "manifesto" is as follows (all misspellings are from the original document):

I have a message for USA Administration, not the current one exactly but for all previous and next administrations.
When you will stop shedding the blood of Muslims? Violating our lands, our honor, and our sancities.
Oh I am sorry you cannot stop because their blood is delicious and they are not refuse or resisting, they are peceful and surrendered for everything you do.
Muslims are the most persecuted and discriminated against in the world, everywhere our blood and souls worthless and does not matter to anyone, that, include by the way the current countries those who claim that they are Muslims.
Don't think that the pigs who were arranged on your pens and whom you made kings and presidents* represent Islam or Muslims, they are your employees and our Enemies.
Muslims has only two clear enemies 1 satan and his followers 2 Zionism and its followers and believers
1 - Satan A constant enemy untill the day of Judgment
2 - Zionism is our enemies untill Jerusalem is liberated and they are expelled from our land.
*and the mercenary soldiers who called Muslims countries Armies
As long as Jerusalem is occupied, there will be no peace or security for anyone
You have previously threatened Muslims with opening the gates of hell, so know that hell is what you and all Zionist will see when Allah allows it, and know that we love the death in seek of allah more than your love for life and money
2.) On 1099 your ancestors occupied Jerusalem for 88 years and when they entered it they killed thousands of Muslims and turned the blessing streets of Jerusalem into rivers of blood and made Al Aqsa Mosque a stable for horses.
1.) Muslims entered Jerusalem for the first time in 637 AD
No harm was done to Christians or non Muslims
The Caliph of Muslims gave them security and did not enter the church of the Holy Sepulchre
3.) In 1187 Muslims returned and liberated Jerusalem, after 88 years of oppression and persecution
4.) after 735 years, British occupied Palestine in 1920 and after the WWI
To start the Zionist mission
In 1948 the announcement of the establishment of the cancer entity which called Israel
Why I am saying all of that "Just to prove that we will return to liberate Jerusalem, no matter how long the occupation lasts
There is no radical or moderate Islam
It's only one but if you mean that anyone against Zionist Interest is radical
So we are all radical

## E. The Defendant's Post-Arrest Statement

The same day as his arrest, the defendant was interviewed by a detective from the Boulder Police Department and an FBI Special Agent at the hospital while he was being treated for burns to his hands and face. The questioning continued later in the Boulder County jail. The defendant

was Mirandized before each interview session, and the interviews were recorded on body worn camera.

During the defendant's interview, he confirmed that he was 45-years old at the time and had moved to the United States from Kuwait. He was living in Colorado Springs, Colorado with his wife and five children and worked as a car service and delivery driver at the time of the attack.

With respect to the June 1, 2025 attack, the defendant said, among other things, that he planned the attack for a year and waited for one of his children to graduate high school before he acted on his plans. He described his purpose in conducting the attack as:

> Just revenge. I, I, I decide to take my revenge from these people. I just search the internet looking for any Zionist event I found here in Boulder. That's it. Every Sunday they are going for walk for the hostages. They care about the hostage party. I not care about. Thousands of hostages from Palestinian for years killed, suffer. No one care about them.

The defendant further admitted that he had thrown two Molotov cocktails and had brought more that he had made but did not throw. He expressed no remorse, explaining, "I told you if I have a chance to do it again, I will do it again. If I have a chance to help them, I'll help them. If I have a chance to go there, I would go and fight them. I have no issues with you." The defendant also said, "I burned them all. I killed them all. This was my dream."

In discussing his views of Zionism, the defendant explained that "anyone supporting the exist[ence] of Israel on our land is Zionist." He described Israel as a "cancer entity" and complained about the inability "to stop this fucking war," which was "not only USA problem" but also a "problem everywhere" including Egypt, where he is from. He further explained: "They happy to announce even their, their Zionist government or Zionist people. They are happy to say, we will kill everyone. We will arrest everything in this area. They are not shy. So we are." He also explained that he took issue with Israel from the time of its recognition in 1948.

The defendant also further described his planning before the attack. He said that he tried

to buy a gun but was unable to, so he made the Molotov cocktails instead. He stated that he bought the glass carafes and jars from Target and the gas in Castle Rock, Colorado. He knew from the internet that the victim group made their walk every Sunday with the message of supporting the release of Zionist hostages, and they stopped in front of the building where he was waiting for them. The defendant denied informing anyone of his plans beforehand.

The defendant said that on the day of the attack, he tried to send messages on TikTok and Telegram and planned to send a message to President Trump on Truth Social but did not have enough time.

**F. Substantial Planning for the Attack**

**a. iPhone Search History**

In the year leading up to the attack, the defendant used his iPhone, which was later provided to law enforcement, to conduct internet searches related to his hateful ideology and to plan the attack. On the iPhone, the first search related to Zionism was on September 3, 2024. No names or other identifiers of victims were found in any of the defendant's devices.

On November 9, 2024, the defendant searched for "concealed carry," and around that time, he began attempting to obtain a permit to carry a firearm. Documents from the El Paso County Sheriff's Office show that the defendant applied for a Concealed Handgun Permit on December 30, 2024, with a payment of $135 via credit card. At that time, he presented a certificate showing he had completed a concealed carry handgun training course on November 4, 2024. He also provided a small game animal hunting license that he obtained on November 21, 2024. On March 21, 2025, the sheriff's office sent a letter to the defendant denying his permit application because the background check had revealed he was a "non-immigrant overstay alien."

Around April 10 and 11, 2025, the defendant continued to search online for "Zionist

communities in Colorado" and "Zionist in Colorado." In the html files in the iPhone, there was an article dated early May 2025 describing the activities of the Boulder Run for Their Lives group. On May 3, 2025, the defendant used his iPhone to search for "Boulder Zionist Event" and "Colorado Zionist Event." Throughout May 2025, the defendant continued to conduct Google searches on his iPhone, including "How many child killed in Gaza?" "US support for Israel," and "military aid to Israel."

The defendant's search history also shows that on May 19, 2025, the defendant searched for a form to create a will. On May 21, 2025, the defendant signed the will he had created, along with two witnesses. That will was later located in his house when it was searched by law enforcement pursuant to a search warrant.

**b. Purchase of materials used in the June 1 attack**

In the final days before the attack, records and videos from various stores show the defendant purchased the following items in preparation:

- On May 30, 2025, at 9:35 am, the defendant purchased a four-gallon backpack weed sprayer from the Home Depot in Castle Rock. Surveillance video shows the defendant asking questions of a sales associate who reported that he had asked about how to use the device. (See screenshot below.)



- On May 30, 2025, soon after noon, he purchased four carafes and twelve Ball jars from Target in Castle Rock.
- On June 1, 2025, at approximately 6:15 am, he purchased gas at a gas station in Castle Rock.
- On June 1, 2025, at approximately 7:30-7:45 am, he purchased scissors, funnels, and sharpies from Walmart in Castle Rock.
- On June 1, 2025, at approximately 8:45 am, he purchased four more carafes from Target in Castle Rock.
- On June 1, 2025, at approximately 9:40 am, he purchased four flowers from the Home Depot in Castle Rock.
- On June 1, 2025, at approximately 9:49 am, he purchased $5.12 in gas from a Loaf N Jug in Castle Rock.
- The defendant stated that he went to the parking lot of a preschool in Castle Rock where

he used the gas cans and funnels to fill the carafes and jars, which is corroborated by grainy surveillance video from across the street from the preschool.

**c. Evidence from Motorola phone**

Investigators determined that the Motorola phone, which was found at the scene near where the defendant was arrested, had been purchased a few weeks prior to the attack. Evidence retrieved from the defendant's iPhone shows efforts to have calls forwarded from the iPhone to the Motorola. The Motorola contained evidence that the defendant searched on Google Maps for the Pearl Street Mall and the Boulder County Historical Courthouse on the day of the attack. Evidence obtained in the course of the investigation showed that the defendant drove from Castle Rock to Boulder on June 1, 2025.

At least 16 relevant videos were found on the Motorola that the defendant filmed the morning before the June 1 attack between approximately 10:37 am and 12:35 pm. In each of the videos, he was driving and filming himself as he explained his beliefs and addressed his family. In one video, the defendant stated, "We know that death is inevitable. Life is a test." The defendant added that one could die in a car accident or while walking, or from a heart attack. "The difference is I choose to die for the sake of Allah… I can die, while taking revenge, and holding my head high. I took revenge on my enemies and retaliated for myself and my brothers. This is the whole story." Shortly before the attack, the defendant sent seven of these videos from the WhatsApp account on the Motorola to the WhatsApp account on the iPhone, which he had left at home. Using the Motorola, he also posted some of these videos on a TikTok account and to a Telegram channel that had one other subscriber.

**G. Additional Admissions by the Defendant**

The defendant admits that he attempted to kill Victims A through H, caused bodily injury

to these victims, and caused the death of Victim A. The defendant admits that he acted because of the actual or perceived Israeli national origins and the actual or perceived Jewish religion of the victims. The defendant admits that he acted willfully when he attempted to kill the victims and attempted to cause bodily injury through the use of the Molotov cocktails, which are fire, dangerous weapons, and explosive and incendiary devices. The defendant admits that he caused permanent or life-threatening injuries to Victims B through H and that Victim F was a vulnerable victim.

The defendant also admits that his conduct occurred during the course of or as a result of the travel of the defendant using a channel, facility, or instrumentality of interstate or foreign commerce; the defendant used a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct; in connection with the conduct, the defendant employed a firearm, dangerous weapon, explosive or incendiary device, or other weapon that had traveled in interstate or foreign commerce; or the conduct otherwise affected interstate or foreign commerce.

## VII. SENTENCING

The defendant understands that the sentence in this case will only be imposed by the Court after consideration of several factors set forth in 18 U.S.C. § 3553(a). One of those factors is the U.S. Sentencing Guidelines (the "Guidelines") and the sentence which the Guidelines recommend. The Court is required by law to both calculate and consider the Guidelines and its recommended sentence. However, the Guidelines are advisory only, and the Court is not required to follow the Guidelines or its recommendations as to sentencing when imposing a sentence in this case.

The defendant has reviewed the Guidelines and the sentence recommended by the Guidelines with counsel. The defendant acknowledges that the defendant cannot rely upon any Guideline calculation or projection made by counsel as (1) no such calculation or projection is

binding on the Court, and (2) no one can predict with certainty the outcome of the Court's independent calculation of the Guidelines at sentencing.

As set forth in Section I of this document, the parties will jointly request a sentence of life imprisonment plus 50 years' imprisonment, to be served consecutive to the sentence imposed in Boulder County case number 25CR785. But the parties also acknowledge that nothing in the agreement presented to the Court and no sentencing expectation, request or recommendation by any party prevents the Court from imposing any sentence, from any applicable mandatory minimum up to the statutory maximum, which the Court considers in its discretion to be sufficient but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

## VIII. ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements, understandings, or assurances of any kind, either express or implied. Neither the United States nor the defendant has relied on, or is relying on, anything said, written or done by any counsel or by any other person or entity that is not expressly disclosed in the agreement presented to the Court.

## IX. EXECUTION ACKNOWLEDGEMENTS BY UNITED STATES

By signing this document below, the United States acknowledges and represents that it will cooperate with the United States Probation Office by providing its Guideline calculations (including relevant conduct) to the Probation Office, along with such other sentencing information as may be requested by the Probation Office in connection with the preparation of any presentence report or addenda. Such requested information may include information concerning the

background, character, and conduct of the defendant including the entirety of the defendant's criminal activities.

## X. EXECUTION ACKNOWLEDGEMENTS BY DEFENDANT

By signing this document below, the defendant acknowledges having read and understood every provision of the entire agreement disclosed to the Court. The defendant's signature further acknowledges and represents that the defendant has reviewed all matters contained in this document with counsel, has had sufficient time to do so, and is fully satisfied with respect to counsel's representations and advice as well as with such interpreter services as have been used. The defendant also acknowledges and represents that the decision to plead guilty is made freely, voluntarily, and after careful thought and consideration. The decision has not been influenced in any way by medications, drugs, alcohol or other intoxicants. It is also acknowledged and represented that the decision to plead guilty is not the result of force, pressure, threats, coercion or outside influence by anyone. The defendant acknowledges and represents that the defendant is pleading guilty because the defendant is guilty. Finally, the defendant acknowledges that the defendant will not be allowed to withdraw any plea of guilty in the future solely because a sentence recommended by the Probation Office or imposed by the Court is different in kind or greater than that expected by the defendant.

Date: 10/29/26 Mohamed Soliman
Mohamed Sabry Soliman
Defendant

Date: 10/29/26 [signature]
David Kraut
Attorney for Defendant

Date: 10/29/26 ______________________________
Jennifer Wickens
Attorney for Defendant

Date: 10/29/26 ______________________________
Kelly Christl
Attorney for Defendant

Date: 10/29/26 ______________________________
Melissa Hindman
Assistant U.S. Attorney

Date: 10/29/26 ______________________________
Daniel Pastor
Assistant U.S. Attorney

Date: 10/29/26 ______________________________
Sarah Howard
Trial Attorney, Civil Rights Division

Date: 10/29/2026 ______________________________
Khalil Quinan
Trial Attorney, Civil Rights Division